**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TARA L. TUCKER,**

    **Plaintiff,**

    v.

                             **Civil Action 2:11-cv-858
                             Judge Algenon L. Marbley
                             Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Tara L. Tucker, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's Reply (ECF No. 16), and the administrative record (ECF No. 9).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the administrative law judge under Sentence Four of § 405(g).

## I. BACKGROUND

Plaintiff filed her application for benefits on July 21, 2008, alleging that she has been disabled since July 1, 2007, at age 27, due to anxiety attacks. (R. at 106-08; 133.) Plaintiff's application was denied initially and again upon reconsideration. Plaintiff requested a *de novo* hearing before an administrative law judge.

On September 21, 2010, Administrative Law Judge Norma Cannon ("ALJ") held a video hearing at which Plaintiff, represented by counsel, appeared and testified. A vocational expert also appeared and testified. On January 3, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 10-21.) In June 2011, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-4.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she did not finish high school. She indicated that she completed the ninth grade and does not have a GED. (R. at 31.) At the time of the hearing, she lived with her parents. (*Id.*) She further indicated that her parents took care of her. (R. at 33-34.) She testified that she had a driver's license, but lost it as a result of an accident involving alcohol. (R. at 32.) Plaintiff represented that she had not consumed alcohol in "five or six years." (*Id.*)

Plaintiff last worked approximately eight years prior to the hearing. Her job entailed working with children who had mental retardation and developmental disabilities. (*Id.*) Plaintiff testified that she stopped working because she could not "handle being around people." (R. at

40.) She added that she would forget how to do certain parts of her job such as folding clothes or blankets a particular way. (R. at 41.) Plaintiff described feeling scared around other people and expressed that she felt scared during the hearing. (R. at 39-40.) Plaintiff stated that she could not be around people because she had a fear of them. (R. at 33-34, 39.) She reported that her medications caused side effects that made her tired and unable to concentrate. (R. at 37.)

Plaintiff testified that she saw a psychiatrist every two months at Community Mental Health. (R. at 36.) She first indicated that she had not seen her counselor for approximately eight months prior to the hearing, but then said that she was not sure when she last attended counseling. (R. at 36-37.) When cross-examined by her counsel, Plaintiff explained that she missed mental health appointments because she did not have a means of transportation. (R. at 39.)

Plaintiff testified that she cooked, took care of her puppy, did laundry, tried to clean, and was sometimes able to shower and take care of her hair. (*Id.*) Plaintiff represented that she did not do any shopping, did not have any hobbies that helped pass the time, and did not visit with friends, neighbors, or family members. (R. at 38.)

**B.     Vocational Expert Testimony**

Eugene Czuczman testified as a vocational expert at the administrative hearing. (R. at 49–52.) Mr. Czuczman testified that Plaintiff's past employment did not equal substantial gainful activity. (R. at 51.) The ALJ asked Mr. Czuczman to consider a person of Plaintiff's age, education background, and work experience who can do a range of work with no exertional limitations; entry-level, unskilled, routine, and repetitive work with things as opposed to people in a stable environment; no production line work; no independent decision making required; no

intense concentration required; and limited contact, as little as possible with the public, coworkers, and supervisors.  (*Id.*)  Based on this hypothetical, Mr. Czuczman testified that such an individual could perform heavy exertional work such as a lumber handler with 75,000 national, 600 regional jobs; medium exertional work such as a scrap sorter with 60,000 national, 100 regional jobs; light exertional work such as a machine cleaner with 60,000 national and 400 regional jobs; and sedentary exertional work such as an ink printer with 75,000 national and 500 regional jobs.  (*Id.*)  Mr. Czuczman testified that if the individual were to be off task greater than one-third of the time, whether it was attributable to lack of concentration, persistence, or pace, or for any reason whatsoever, the individual would not be employable.  (R. at 51-52.)

### III.  MEDICAL RECORDS

The record contains treatments notes from Plaintiff's family physician, Mandal B. Haas, M.D. dated from March 2006 to April 2008.  (R. at 182-91.)  Initially, Plaintiff reported a seven-month history of "bad anxiety."  (R. at 188.)  In September 2007, two weeks after Plaintiff was involved in a motor vehicle accident, Dr. Haas reported that Plaintiff's mood and affect were appropriate with no apparent thought disorder but that her speech was slightly rapid and intense.  (R. at 187.)  On November 5, 2007, Dr. Haas reported that Plaintiff was in no acute distress and exhibited a flat affect, but that she demonstrated no evidence of a thought disorder, fragmentation, or delusional thinking.  (R. at 186.)  He adjusted her anxiety medication.  (*Id.*)  On April 22, 2008, Dr. Haas adjusted Plaintiff's anxiety medication again.  (R. at 185.)

David R. Bousquet, M.Ed., examined Plaintiff on behalf of the state agency on September 9, 2008.  (R. at 202-09.)  Mr. Bousquet reported that Plaintiff was quite anxious and fearful during the examination.  By way of example, he noted that she cracked her knuckles,

wrung her hands, and rocked back and forth. (R. at 204.) Mr. Bousquet felt that Plaintiff was not deliberately exaggerating and/or minimizing current and/or past problems. (*Id.*) She spoke softly and had to be asked to repeat herself. (*Id.*) Mr. Bousquet considered Plaintiff's mood to be anxious and depressed. (*Id.*) Mr. Bousquet estimated that Plaintiff's cognitive abilities fell in the low average to average range. (R. at 206.) He diagnosed Plaintiff with major depressive disorder, recurrent, without psychotic features; post traumatic stress disorder, chronic; and personality disorder, not otherwise specified with dependent and avoidant features. (R. at 207.) He assigned her a Global Assessment of Functioning ("GAF") score of 50.[1] (*Id.*)

      Mr. Bousquet opined that Plaintiff had moderate to marked impairment in her ability to relate to others, including co-workers and supervisors; mild to moderate impairment in her ability to maintain attention and concentration in order to perform simple, repetitive tasks; no impairment in her ability to understand, follow, and remember simple/basic instructions and/or directions; moderate impairment in her ability to understand, follow, and remember detailed and complex instructions and directions; marked impairment in her ability to maintain persistence and pace from an emotional or psychological perspective; and marked impairment in her ability to deal with work stress and pressure and effectively adapt. Mr. Bousquet concluded that under conditions of stress and pressure, it is likely that Plaintiff would experience a decompensation of her emotional and social functioning. (R. at 208.)

---

      [1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR"). A GAF score of 50 is indicative of "severe symptoms . . . or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) . . . ." *Id.* at 34.

State agency physician Cindy Matyi, Ph.D. prepared a Mental Residual Functional Capacity Assessment on September 27, 2008, based upon Plaintiff's clinical interview with Mr. Bousquet.  (*See* R. at 210-13.)  Dr. Matyi opined that Plaintiff had moderate limitations in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and in the ability to set realistic goals or make plans independently of others. (R. at 210-11.)  Dr. Matyi further found that Plaintiff had marked limitation in the ability to interact appropriately with the general public.  (R. at 211.)  Dr. Matyi concluded that although Plaintiff's condition interfered to some extent with detailed instructions, she could perform some multi-step tasks if given a bit of time.  (*Id.*)  She opined that Plaintiff could relate adequately to supervisors and coworkers on a superficial basis, but would do best in an environment that entailed minimal interaction in which she was not under close supervisory scrutiny.  (*Id.*)  Dr. Matyi further opined that Plaintiff could adapt to a setting in which duties were routine and predictable, but that she could not be expected to adhere to strict time limits or production standards.  (*Id.*)  Dr. Matyi found Plaintiff's allegations only partially credible.  (*Id.*)  Finally, Dr. Matyi prepared a "Psychiatric Review Technique" in which she opined that Plaintiff had

moderate restrictions in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace. (R. at 224.)

Plaintiff began treating at Community Mental Health Care on September 11, 2008. Initially, Plaintiff saw Bonnie Thomas, LSW, MSW. (R. at 231.) Ms. Thomas diagnosed Plaintiff with a depression disorder not otherwise specified, rule out bipolar disorder, and rule out alcohol abuse. (*Id.*) Ms. Thomas noted that Plaintiff experienced psychosocial and environmental problems, including problems relating to her primary support group, social environment, crime, and access to health care, as well as occupation, housing, and economic problems. (*Id.*) Ms. Thomas assigned Plaintiff a GAF score of 52. (*Id.*) On December 5, 2008, Plaintiff showed Ms. Thomas where she had superficially self-inflicted a cut on her arm in anger. (R. at 234.)

That same day, Plaintiff presented to the emergency department at Aultman Hospital for polypharmacy overdose with suicide attempt. (R. at 298-310.) The EMS report indicated that she swallowed Xanax tablets and drank five beers and also that she had stated that she wanted to die. (*Id.*) Plaintiff was admitted to the intensive care unit for observation. On December 7, 2008, her diagnoses were listed as polypharmacy abuse, tobaccoism, suicide attempt, depression/anxiety, GI (gastrointestinal), DVT (deep vein thrombosis) prophylaxis, and Tylenol overdose. (R. at 301.) Plaintiff was discharged on December 9, 2008. (R. at 298.)

In February 2009, Ms. Thompson reported that Plaintiff's appearance was presentable and that her flow of conversation and speech were coherent, but described her mood and affect as depressed and anxious. Ms. Thompson also reported that Plaintiff had poor concentration,

was easily distracted, and experienced stress in social situations.  She concluded that Plaintiff could not handle the pressures associated with a public work setting.  (R. at 229-30.)

On February 10, 2009, Shirley Workman, APRN conducted a court-ordered psychiatric evaluation.  (R. at 262-63.)  Plaintiff reported that she had a breakdown and had overdosed on medication and Nyquil, was having suicidal thoughts, and was tired of feeling nervous all the time.  (R. at 262.)  Ms. Workman found that Plaintiff's mood was anxious, her affect was restricted, her thoughts were organized and relevant, and that she exhibited no psychotic symptoms or suicidal ideations.  (R. at 263.)  Plaintiff reported a decline in her short-term memory and concentration.  (*Id.*)  Ms. Workman diagnosed Plaintiff with major depression, recurrent; anxiety disorder; and history of alcohol abuse, assigning her a GAF score of 60.[2]  (*Id.*)  Plaintiff was prescribed Trazadone and Paxil with no refills.  (*Id.*)  On March 3, 2009, Ms. Workman noted that Plaintiff's posture was relaxed with good eye contact, her mood was anxious, her affect was within normal ranges, her thoughts were organized and relevant, and she exhibited no psychotic symptoms or suicidal ideations.  (R. at 260.)  On June 23, 2009, Plaintiff's mood was noted to be dysphoric and her affect restricted.  (R. at 270.)

On May 27, 2009, Ms. Thompson reported that Plaintiff had been compliant with her treatment and had "made great strides."  (R. at 259.)  She also reported that Plaintiff had not been in the office since February 2009.  She explained, however, that Plaintiff's absence was "due in part to her physical health and the fact that she had to move out of her parent's home

---

[2] A GAF score of 51-60 indicates that a person has "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

because of the behavior of her father." (*Id.*) Ms. Thompson added that "[d]istance and finances have kept her from coming into the office, but she has kept in touch . . . ." (*Id.*)

Psychiatrist Bharat Oza, M.D. saw Plaintiff in September 2009. Dr. Oza reported that Plaintiff appeared depressed and noted that her major depression continued. (R. at 267.)

In January 2010, psychiatrist Madhubala Kothari, M.D. noted that Plaintiff had been without medication "for quite some time and she has multiple problems." (R. at 266.) He prescribed Celexa and Vistaril. (*Id.*) In March 2010, Plaintiff reported to Dr. Kothari that she was feeling anxious and depressed. (R. at 283.) In July 2010, Dr. Kothari noted that Plaintiff seemed to be doing fine in terms of mood, affect, and behavior but noted that she was having a lot of family problems and felt stressed out. Dr. Kothari increased Plaintiff's Prozac and added Trazadone to her medications. (R. at 282.)

At the administrative hearing in September 2010, the ALJ requested that Plaintiff have a mental status evaluation to obtain updated information regarding her psychological limitations. (R. at 52-53.)

Vernon Brown, Ph.D. performed a consulting examination and evaluation of Plaintiff on October 27, 2010. (R. at 287–97.) Dr. Brown found Plaintiff to be depressed and anxious with blunted affect. He reported that she appeared quite apprehensive at the beginning of the interview. He explained that Plaintiff seemed almost fearful leaving her mother behind in the waiting area. Dr. Brown noted that Plaintiff seemed to be functioning in the low average range of intellectual functioning. He found that her ability to concentrate and her immediate recall were severely impaired. He noted that Plaintiff's recent memory appeared moderately impaired and that her remote memory appeared severely impaired. He reported that Plaintiff experiences

9

psychotic thought processes. Plaintiff described frequent visual hallucinations and delusional beliefs that her boyfriend was cheating on her. She admitted that she could offer no reason for this belief. She also reported experiencing ideas of reference. Plaintiff described incidents of diminished impulse control and recounted more than one incident wherein she had struck her boyfriend. Plaintiff reported that she had not had any alcoholic beverages in the prior two years and that she had drank only occasionally before that. She reported that she has not experienced problems with alcohol since her inpatient treatment many years ago. Dr. Brown noted that Plaintiff had a significant problem with alcohol as a teenager, but concluded that alcohol did not seem to play any role in her current difficulties. Plaintiff reported depressive symptoms of sadness with crying spells. She indicated that she had experienced suicidal ideation as recently as two weeks prior to the evaluation. Dr. Brown noted that Plaintiff had a history of suicide attempts, at least one of which resulted in hospitalization. Plaintiff reported frequent panic attacks and described symptoms of agoraphobia. (R. at 287-95.) Dr. Brown made an initial diagnostic impression of psychotic disorder NOS, panic disorder with agoraphobia, alcohol abuse (in sustained full remission), and personality disorder NOS. (R. at 296.) He assigned Plaintiff a symptoms GAF score of 35 based upon her hallucinations, delusions, and ideas of reference, and a functioning GAF score of 40 based on noted major impairments in several areas such as family, occupational, and social. (*Id.*) Dr. Brown noted that Plaintiff had economic problems, primary support group problems, and problems related to social environment. (*Id.*) He opined that Plaintiff was extremely impaired in her ability to withstand the stresses and pressures associated with day-to-day work activity. (R. at 297.)

      Dr. Brown also completed a Medical Source Statement of Ability To Do Work-

Related Activities (Mental).  (R. at 284-86.)  Dr. Brown opined that Plaintiff had moderate limitation in her ability to make judgments on simple work-related decisions; marked limitation in her ability to understand and remember complex instructions; marked limitation in her ability to carry out complex instructions; and marked limitation in her ability to make judgments on complex work-related decisions.  (*Id.*)  Dr. Brown also opined that Plaintiff had marked limitation in her ability to interact appropriately with the public; marked limitation in her ability to interact appropriately with supervisor(s); marked limitation in her ability to interact appropriately with co-workers; and extreme limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting.  (R. at 285.)  Dr. Brown listed paranoia and ideas of reference as factors to support of his assessment.  (*Id.*)  Dr. Brown opined that Plaintiff was not able to function independently and noted that her mother was assisting her with her claim.  (*Id.*)  He reported that her limitations first manifested in 2000.  (*Id.*)  Dr. Brown concluded that Plaintiff could not manage her own benefits and that both parents were reportedly alcoholics.  (R. at 286.)

## IV.  THE ADMINISTRATIVE DECISION

On January 3, 2011, the ALJ issued her decision.  (R. at 10-21.)  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantially

gainful activity since July 21, 2008.[3]  (R. at 12.)  The ALJ found that Plaintiff had the following severe impairments: ovarian cyst; major depressive disorder; anxiety disorder; personality disorder; and a history of alcohol abuse.  (*Id.*)  She further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  In doing so, the ALJ explicitly considered the provisions of Section 12.00 dealing with mental disorders and Section 13.00 relating to malignant neoplastic diseases.

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: work should be entry level, unskilled, routine and repetitive; working primarily with things, rather than people in a stable environment; no production line work; no independent

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

>decision-making; no intense decision-making required; and as little contact as possible with the public, coworkers and supervisors.

(R. at 18.) The ALJ found that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. She concluded, however, that Plaintiff was not credible with regard to the intensity, persistence, and limiting effects of her symptoms to the extent her statements were inconsistent with RFC she had assigned. (R. at 19.) In reaching this determination, the ALJ explicitly noted that Dr. Brown's opinion that Plaintiff has marked limitations in all areas of social functioning to be based upon Plaintiff's subjective complaints, rather than upon any objective findings. (*Id.*) The ALJ did not explain her reasons for rejecting elements Mr. Bousquet's opinion. Nor did she articulate the basis for her RFC determination.

Relying on the Mr. Czuczman's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 20.) She therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 21.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

In her Statement of Errors, Plaintiff first asserts that the ALJ's refusal to accord controlling or at least "great weight" to the opinions of the medical sources constitutes reversible error. Within this contention of error, Plaintiff argues that the ALJ failed to properly support her RFC such that the limitations she sets forth "can only be viewed as an attempt to render her own medical opinion which violates Social Security Regulations and case law." (Pl.'s Statement of Errors 18, ECF No. 10.) Plaintiff further posits that the ALJ improperly assessed the "Paragraph B" criteria of Listings 12.04, 12.06, and 12.08; failed to properly assess Listing 12.04(c); and

14

improperly assessed Plaintiff's credibility. Finally, Plaintiff maintains that she was erroneously denied a supplemental hearing. For the reasons that follow, the undersigned finds that the ALJ's failure to include any discussion concerning how she arrived at her RFC determination constitutes reversible error.[4]

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory

---

[4] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

> findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

In this case, the ALJ provided *no discussion at all* as to how she arrived at Plaintiff's RFC determination. Plaintiff speculates that the ALJ simply rendered her own medical opinion. The Commissioner, in his Memorandum in Opposition, appears to suggest that the ALJ relied upon Dr. Matyi's opinion, noting that "[t]he ALJ's finding largely adopted Dr. Matyi's findings." (Def.'s Mem. in Opp. 6, ECF No. 13.) This Court, however, must review the ALJ's rationale, not defense counsel's. Notably, the ALJ's decision does not even mention Dr. Matyi's opinions or findings, let alone adopt them.

The ALJ's lack of articulation prevents this Court from conducting meaningful review to determine whether substantial evidence supports her decision. *See Rogers*, 486 F.3d at 248 n.5 (quoting *Hurst v. Sec'y of Health & Hum. Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review."); *Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *2 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)) ("Importantly, an ALJ must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.' The reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review.")

This Court must, therefore, remand this action for an explanation of the reasoning supporting the ALJ's RFC determinations.  *See, e.g., Evans v. Comm'r of Soc. Sec.*, No. 1:10–cv–779, 2011 WL 6960619, at *14, 16 (S.D. Ohio Dec. 5, 2011) (Report and Recommendation), adopted, 2012 WL 27476 (S.D. Ohio Jan. 5, 2012) (remanding where the Court was "unable to discern from the ALJ's opinion how he arrived at the RFC decision and what evidence he relied on in making that decision," explaining that "[s]imply listing some of the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the 'narrative discussion' requirement of SSR 96–8."); *Perkins v. Comm'r of Soc. Sec.*, No. 1:10-cv-233, 2011 WL 2457817, at *5–6, 9 (S.D. Ohio May 23, 2011) (Report and Recommendation), adopted, 2011 WL 2443950 (S.D. Ohio June 16, 2011) (same); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *8 (N.D. Ohio Apr. 4, 2012) (remanding where "the ALJ failed to properly articulate the RFC calculation," explaining that the Court was "unable to trace the path of the ALJ's reasoning"); *Commodore v. Astrue*, No. 10-295, 2011 WL 4856162, at *4, 6 (E.D. Ky. Oct. 13, 2011) (remanding action "with instructions to provide a more thorough written analysis" where the ALJ failed to articulate the reasons for his RFC findings such that the Court could not "conduct a meaningful review of whether substantial evidence supports the ALJ's decision"); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

17

To be clear, the undersigned is not suggesting that SSR 96-8 requires a function-by-function analysis of Plaintiff's RFC.  Nor is the undersigned suggesting that an ALJ is required to specifically reference every piece of evidence.  Rather, the undersigned simply concludes that the ALJ's decision must provide some explanation of how the record evidence supports her RFC determination.  *See* S.S.R. 96–8p, 1996 WL 374184, at *6–7; *Perkins*, 2011 WL 2457817, at *6 ("In rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and the findings associated with the particular RFC limitations to enable this Court to perform a meaningful judicial review of that decision.  Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at her RFC determination.").

## VII.  CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  Accordingly, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

18

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate
review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: August 17, 2012                                  /s/ *Elizabeth A. Preston Deavers*
                                                                     Elizabeth A. Preston Deavers
                                                                     United States Magistrate Judge

19